**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**

**ATLANTIC COAST LIFE INSURANCE COMPANY,**

Plaintiff,

v.

**DENISE GAWAJEK, et al.,**

Defendants.

**Case No. 1:25-cv-00706**

**Judge McFarland**

**LORETTA SCHMIDT'S MOTION FOR SUMMARY JUDGMENT**

Defendant Loretta Schmidt moves for summary judgment on her cross-claims for declaratory judgment and disbursement of interpleaded funds (doc. 6).

This case is about who is entitled to what share of death benefits under an annuity contract between decedent Ken Schmidt and plaintiff Atlantic Coast Life Insurance Company. The undisputed evidence shows that Ken Schmidt executed a valid beneficiary designation under which Loretta Schmidt is entitled to 50% of those funds, and the other parties are entitled to either 10% or 20%. The Court should issue a declaration of those rights and order the Clerk to disburse those funds in accordance with that beneficiary designation.

## BACKGROUND AND FACTS

The following facts are taken from the uncontested allegations of the complaint (doc. 1) and its exhibits; from the affidavit of non-party Kenneth Stanfield (doc. 21-1);

and from the medical records produced by Ken Schmidt's neurologists at Riverhills (doc. 22-2).

Ken Schmidt, who died in December 2023, is the father of defendants Denise Gawajek, Kelly Hesketh, Kerri Schmidt, and Jeff Schmidt. *See* doc. 21-2 (Stanfield Aff.) at PAGEID #: 18, ¶8. (Because several parties share the last name Schmidt, this brief will typically refer to the parties by their first names.) Ken was divorced from defendant Loretta Schmidt, but Ken and Loretta lived together. *Id.* at ¶9.

In 2017, on Jeff's application, the Hamilton County (Ohio) Probate Court established a guardianship for Ken. Jeff was appointed as the guardian. *See* doc. 1 (Complaint) at PAGEID #: 3, ¶12.

From 2019 to 2022 Ken consulted periodically with physicians, nurse practitioners, and other clinicians at Riverhills Neurology or Riverhills Neuroscience. *See* doc. 22-2 (Riverhills medical records) at PAGEID #: 22-97. In December 2020, with consent of his then-guardian Jeff, Ken underwent a neuropsychological evaluation through Riverhills by Dr. Megan Marlow O'Connor, Ph.D. Dr. O'Connor determined that Ken suffered from only "mild cognitive impairment," and concluded that "[Ken's] current neurocognitive profile is not suggestive of Alzheimers disease as he does not demonstrate hallmark characteristics such as rapid forgetting or semantic language dysfunction." *See* doc. 22-2 (Riverhills medical records) at PAGEID #: 60. The probate court then terminated the guardianship in February 2021, on the ground "that there is

no further need for the guardianship to remain open." Doc. 1 (Complaint) at PAGEID #: 3, ¶13; doc. 1-5 (entry terminating guardianship) at PAGEID #: 72.

Ken continued to be seen at Riverhills until 2022, including evaluations for issues such as balance problems and numbness that are common in octogenarians, and he was never diagnosed with anything beyond mild cognitive impairment. *See* doc. 22-2 (Riverhills medical records) at PAGEID #: 22-97.

Non-party Kenneth Stanfield has continuously worked as an insurance agent in Ohio since he was first licensed as such in 1984. He is the principal of Wealth Retirement Group, LLC, and as such is an agent for Atlantic Coast. *See* doc. 21-1 (Stanfield Aff.) at PAGEID #: 18, ¶2-5. When meeting with a client to discuss any insurance or financial product, but particularly when meeting to discuss an annuity, it is Stanfield's practice to take time to understand the client's personal financial circumstances and their family and relationships, and also to satisfy himself that the client has the capacity to make financial decisions such as the purchase of an annuity. *See* doc. 21-1 (Stanfield Aff.) at PAGEID #: 18, ¶7.

In April of 2022 Stanfield met Ken at Ken's home for the purpose of discussing the purchase of an annuity. *See* doc. 21-1 (Stanfield Aff.) at PAGEID #: 18, ¶6. Based on Stanfield's discussions with Ken, and based on Stanfield's experience as an insurance agent since 1984, Stanfield believed Ken to be of sound mind and to have the capacity to purchase the annuity. *See* doc. 21-1 (Stanfield Aff.) at PAGEID #: 18, ¶10. In particular,

Stanfield found that Ken understood the purpose of their meeting, that Ken understood his assets and financial condition, that Ken knew the names of his family members, and that Ken understood and appreciated his relation to his family, including both his four children and Loretta, with whom Ken resided even though they were divorced. *See* doc. 21-1 (Stanfield Aff.) at PAGEID #: 18, ¶6-10. If Stanfield had not found Ken to satisfy those conditions, he would not have recommended that Ken purchase an annuity. *See* doc. 21-1 (Stanfield Aff.) at PAGEID #: 18, ¶11-12.

Ken did want to purchase an annuity, and Stanfield completed the application with him. *See* doc. 21-1 (Stanfield Aff.) at PAGEID #: 18, ¶12. When applying for the annuity Ken supplied a beneficiary form that allocated death benefits in the following proportions: 20% to Denise, 20% to Jeff, 20% to Kelly, and 40% to Kerri. *See* doc. 1-3 (beneficiary designation in policy) at PAGEID #: 63. Atlantic Coast issued policy no. 02204119079 to Ken. *Id.* at PAGEID #: 23.

More than a year and a half later, in December of 2023, Stanfield met with Ken at Ken's home again. *See* doc. 21-1 (Stanfield Aff.) at PAGEID #: 19, ¶15. The purpose of the meeting was Ken's desire to change the beneficiary designation on the annuity—specifically, Ken wanted to provide for Loretta, with whom he lived even though they were divorced. *See* doc. 21-1 (Stanfield Aff.) at PAGEID #: 19, ¶18. As it was before, one purpose of Stanfield's meeting with Ken was for Stanfield to satisfy himself that Ken understood the purpose of their meeting, that Ken understood his assets and financial

condition, that Ken knew the names of his family members, and that Ken understood and appreciated his relation to his children and Loretta. Stanfield was satisfied that Ken did. *See* doc. 21-1 (Stanfield Aff.) at PAGEID #: 19, ¶15-17. Stanfield did not observe any signs of undue influence or duress, and based on Stanfield's observations of and interactions with Ken, Stanfield was satisfied that Ken made the beneficiary change voluntarily under his own free will. *See* doc. 21-1 (Stanfield Aff.) at PAGEID #: 19, ¶19. Stanfield personally observed Ken sign the change-of-beneficiary form. *See* doc. 21-1 (Stanfield Aff.) at PAGEID #: 19, ¶20. The new designation allocated death benefits in the following proportions: 50% to Loretta, 10% to Denise, 10% to Jeff, 10% to Kelly, and 20% to Kerry. Atlantic Coast acknowledged and accepted the change the following week. *See* doc. 1-8 at PAGEID #: 161 (letter from Policy Service Department).

Ken died in December 2024, more than a year after executing the change of beneficiary form. *See* doc. 1-9, PAGEID #: 162 (death certificate).

In February 2025, Kelly contacted Atlantic Coast and claimed that the change-of-beneficiary designation was fraudulent, falsely claiming that Ken had been diagnosed with dementia some nine years earlier. *See* doc. 1-12 at PAGEID #: 170 (emails between Kelly and Atlantic Coast). Atlantic Coast asked Kelly whether she had any court order to that effect, *id.* at PAGEID #: 169, and Kelly admitted that she did not. *Id.* But rather than pay on the annuity in accordance with the beneficiary designation on file, Atlantic

Coast filed this action, and interpleaded the proceeds of the annuity. *See* docket text entry of July 29, 2025.

## ARGUMENT

There is no genuine issue of material fact for trial. The parties agree that Ken purchased the annuity and that the parties are the only claimants to the proceeds. The parties also agree that Ken initially designated Denise, Kelly, Kerri, and Jeff as beneficiaries of the annuity contract.

The undisputed record evidence shows that Ken executed a change-of-beneficiary form more than a year and a half after purchasing the annuity (as he was permitted to do under the terms of the policy), and that did so because he wanted to also provide for Loretta. The undisputed record also shows that Ken had contractual capacity at the time he changed the beneficiaries.

Under the terms of the policy, Atlantic Coast was obligated to pay Loretta 50% of the proceeds of the annuity. Because Atlantic Coast interpleaded the funds rather than fulfill its contractual obligation, Loretta is entitled to a declaratory judgment to resolve the dispute, and to an order distributing the funds in accordance with the updated beneficiary designation.

### 1. The annuity is valid contract that must be enforced according to its terms, including the updated beneficiary designation.

"An annuity is a contract that provides for the payment of a sum of money . . . ." *Whitman v. Estate of Whitman*, 2018 U.S. Dist. LEXIS 74814 at *17 (S.D. Ohio no. 1:17-cv-

667, May 3, 2018). Because "[a]n annuity is purely contractual in nature," it is subject to "the regular rules" of contract formation and interpretation. *JG Wentworth LLC v. Christian*, 2008-Ohio-3089, ¶29 (Ohio App. 7th Dist.), citing *Adams v. Adams*, 2003-Ohio-3703, ¶15 (Ohio App. 12th Dist.).

A contract is formed when parties with capacity to contract exchange an offer, an acceptance, and consideration, regarding a lawful object or purpose. *See Lake Land Emp. Group of Akron, LLC v. Columber*, 101 Ohio St.3d 242, 2004-Ohio-786, ¶14. Terms in a contract are given their ordinary meaning unless a contrary meaning appears in the contract itself.

There is no genuine dispute that those elements are satisfied Ken submitted an application for an annuity to Atlantic Coast. *See* doc. 1-7 (application); doc. 21-1 (Stanfield Aff.) at PAGEID #: 18, at ¶12 (averring that application was submitted by Ken). Atlantic Coast accepted his application and indicated its assent by issuing the policy. *See* doc. 1-3 (policy); doc. 21-1 (Stanfield Aff.) at PAGEID #: 18, at ¶14 (identifying issued policy). An annuity is, of course, a lawful purpose.

With the annuity contract having been made, it must be enforced according to its terms. The terms of the annuity policy at issue here obligate Atlantic Coast, in the event of Ken's death, to pay a certain amount of money to his designated beneficiary or beneficiaries. *See* doc. 1-3 (policy) at PAGEID #: 39 ("We will make payment in accordance with the latest Beneficiary designation."). The policy specifically provides

that Ken could update the beneficiaries at any time during his life by executing a written request to change the beneficiary. *See* doc. 1-3 at PAGEID #: 32 ("Change of Owner or Beneficiary"). Ken did in fact update his beneficiary designation, *see* doc. 1-8 at PAGEID #: 159-160 (change form), and Atlantic Coast responded to "acknowledge that [it] ha[d] reviewed and accepted [Ken's] beneficiary change" on the policy. *Id.* at PAGEID #: 161 (acknowledgement letter).

Under the plain text of the beneficiary designation, Loretta is entitled to 50% of the proceeds, *see id.* at PAGEID #: 159. The other defendants are entitled to the following amounts: 10% each to Denise, Jeff, and Kelly, *id.* at 159-160; and 20% to Kerri, *id.* at 160. The Court should issue a so declaring the parties' rights, and ordering distribution of the proceeds in those amounts.

**2. It is not Loretta's burden to prove that Ken had contractual capacity—but the record establishes that Ken *did* have contractual capacity.**

The other defendants may claim that Ken lacked capacity to make the beneficiary change.

"The party seeking to void a legal document due to a lack of capacity has the burden of proof by clear and convincing evidence." *Lah v. Rogers*, 125 Ohio App.3d 164, 175 (Ohio App. 11th Dist. 1998). There is no such record evidence.

On the contrary, even though it is not Loretta's burden to prove it, the record evidence affirmatively establishes that Ken had contractual capacity. A signer has capacity when he "has sufficient mind and memory: First, to understand the nature of

the business in which he is engaged; second, to comprehend generally the nature and extent of his property; third, to hold in his mind the names and identity of those who have natural claims upon his bounty; fourth, to be able to appreciate his relation to the members of his family." *Lah v. Rogers*, 125 Ohio App.3d 164, 175 (Ohio App. 11th Dist. 1998), citing *Niemes v. Niemes* (1917), 97 Ohio St. 145, paragraph four of syllabus.

The record evidence satisfies each of those elements, in two ways.

The first way the record establishes Ken's capacity is via the affidavit of Stanfield, who has four decades of experience in the insurance industry working with clients like Ken. Stanfield avers that he personally met with Ken when Ken made both the application and beneficiary change. *See* doc. 21-1 (Stanfield Aff.) at PAGEID #: 19-20, at ¶6, 15. Stanfield observed Ken sign the documents, *id.* at ¶20, and Stanfield avers that when Ken did so, Ken understood what he was doing with the annuity and why, that Ken understood his financial circumstances, and that Ken knew and appreciated the names of his family members and his relationships with and to them. *Id.* at ¶7-12 (regarding original application) and ¶16-20 (regarding change of beneficiaries).

The second way the record establishes Ken's capacity is via Ken's medical records. Even though Ken was the subject of a guardianship earlier in his life, the medical records and court records show that the guardianship was terminated because he did not need it. *See* doc. 1-3 at PAGEID #: 72 (order terminating guardianship because "the Court finds that there is no further need for the guardianship to remain

open."). In particular, the medical records show that Ken did *not* have Alzheimer's, as Kelly has apparently claimed. *See* doc. 22-2 (Riverhills medical records) at PAGEID #: 60 (report of Dr. O'Connor concluding that "[Ken's] current neurocognitive profile is not suggestive of Alzheimers disease"). The medical records from Ken's final examination by Riverhills describe summarize the findings of his neurological exam as follows: "Mental status: alert and oriented to person, place, time and situation. Able to follow commands, language fluent, comprehension intact, long term memory intact." *Id.* at PAGEID #: 85.

In addition, even if Ken *did* have Alzheimer's (or any other form of dementia), that would not mean that he lacked contractual or testamentary capacity. Instead, the question is whether (or the degree to which) any illness or disease affected Ken's ability to understand the purpose of the transaction, to know and appreciate the financial condition, to identify and understand the relationships with family, and so on. *See In re Estate of Flowers*, 2017-Ohio-1310, ¶86 (Ohio App. 6th Dist.) ("Evidence of dementia alone is insufficient to establish a lack of testamentary capacity; there must be evidence of how the dementia impacted the person's testamentary capacity."); *In re Estate of Marsh*, 2011-Ohio-5554, ¶28, 34 (Ohio App. 2d Dist.) ("We recognize, as did the trial court, that Elaine presented evidence that Clara was evidencing signs of dementia, including short term memory loss, and that her ability to manage her medication. . . . {¶34} Even accepting the evidence of Clara's dementia/Alzheimer's as

true, it is not enough to show that the testator had Alzheimer's disease, even if the Alzheimer's disease existed at the time the will was executed. The plaintiff must also show that Alzheimer's disease actually affected the testator's capacity to execute the will.") (internal quote omitted). There is no evidence in the medical records that Ken was suffering from any affliction that affected his contractual or testamentary capacity.

## CONCLUSION

For the foregoing reasons, the Court should issue a declaratory judgment holding that Loretta Schmidt is entitled to 50% of the proceeds of the annuity; that Denise Gawajek, Jeff Schmidt, and Kelly Hesketh are each entitled to 10%; and that Kerry Schmidt is entitled to 20%. The Court should direct the Clerk to disburse the funds on deposit in accordance with its declaratory judgment.

Respectfully submitted,

*/s/ Jeffrey M. Nye*

Jeffrey M. Nye (0082247)
SSP LAW Co., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
Tel. (513) 533-6714
Fax (513) 533-2999
jmn@sspfirm.com
***Attorney for Defendant Loretta A. Schmidt***